Janis M. ALBEE, et al., Plaintiff,

v.

**VILLAGE OF BARTLETT, ILLINOIS, a municipal corporation, Defendant.**

**No. 93 C 2351.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 15, 1994.

Charles Cohn, Cohn & Cohn, Chicago, IL, for plaintiff.

John T. Weise, Richard B. Lapp, Deborah A. Kop, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant.

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Thirty-nine current and former employees of the Police Department of the Village of

Bartlett ("Bartlett") seek a declaratory judgment that Bartlett has violated (1) certain contractual obligations and (2) the overtime provisions of the Fair Labor Standards Act ("FLSA") by imposing various restrictions on its employees' daily half-hour lunch breaks—restrictions that assertedly transform the employees' free time into compensable work time. Bartlett has responded with a Fed. R.Civ.P. ("Rule") 56 motion for summary judgment, which is now fully briefed and ripe for decision. For the reasons stated in this memorandum opinion and order, Bartlett's motion is granted in its entirety and this action is dismissed.

Analysis of Bartlett's motion is made somewhat more complicated by the Complaint's linkage of the claims of five categories of Bartlett employees:

> 1. three types of sworn police personnel—patrol officers, detectives and sergeants (unlike employees within the first two categories, sergeants are supervisory officers); and

> 2. two types of non-sworn civilian personnel—community service officers who perform certain police duties ("CSOs")[1] and record clerks ("clerks").

Because the several groups do share a number of constraints (or lack of constraints) on their activities, this opinion can and does indulge a substantial amount of collective discussion of the applicable principles. But it will also make clear where differences exist among the categories of employees.

1. CSOs perform functions such as animal control, departmental errands, report-taking, routine patrol and the writing of parking tickets (P.Mem. 20).

2. This District Court's General Rule ("GR") 12(M) facilitates the resolution of Rule 56 motions by requiring all movants to submit statements of assertedly uncontested facts, with citations to the record in support of each. GR 12(N) requires each nonmovant to respond to the GR 12(M) statement point by point, with citations to the record in support of (1) any claimed contest of the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Instead of complying with GR 12(N), the plaintiff employees have ignored Bartlett's submission and have instead proffered what amounts to their own GR 12(M) statement—one that is not directly responsive to, and is totally

*Facts*[2]

Until January 1990 all categories of employees at issue in this case were scheduled for 8–hour shifts with half-hour unpaid meal breaks. Then in January 1990 Bartlett's sergeants, and in May 1993 its patrol officers, were rescheduled to 12–hour shifts with a paid lunch period. Although that new arrangement renders the current dispute moot for the sergeants and patrol officers after those dates, they still seek to recover money that they claim is due them for the periods before the changes. As for the other three categories—detectives and the two categories of unsworn personnel—they still remain subject to the arrangement described in the first sentence of this paragraph.

As an employer engaged in public law enforcement, Bartlett has the right under 29 U.S.C. § 207(k) ("Section 207(k)"[3]) to eschew the standard 40–hour work week otherwise mandated by Section 207(a) and instead to substitute a different work period arrangement for its sworn personnel (*Alexander v. City of Chicago,* 994 F.2d 333, 334 (7th Cir. 1993)). Bartlett has exercised that Section 207(k) option, and all of its officers, detectives and sergeants are paid at time-and-a-half for all work performed above and beyond 85–1/2 hours for any two-week period (D. 12(m) ¶ 19). CSOs, on the other hand, do receive overtime for any hours worked in excess of 40 per week (*id.* ¶ 20), and that is presumably true of clerks as well.

silent with respect to, most of the facts set out by Bartlett. In so doing the employees have subverted GR 12's valuable function of fleshing out the issues actually in dispute—and under such circumstances, this opinion treats Bartlett's facts as admitted (*Doe v. Cunningham,* 30 F.3d 879, 882–83 (7th Cir.1994); *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 452–53 (7th Cir.1994); and other cases cited in both opinions). Citations to the parties' GR 12 statements will take the forms "D. 12(m) ¶—" and "P. 12(n) ¶—."

3. All of this opinion's citations to FLSA provisions will take the form "Section—," employing the Title 29 numbering rather than FLSA's internal numbering. As will be seen later, some of the case law employees the latter, citing Section 207(k) as "Section 7(k)." That difference in usage should create no confusion, given the obvious correlation between the two numbers.

For the first 15 minutes of every shift, all patrol officers, sergeants and CSOs participate in roll call, where the patrol officers (in order determined by seniority) and then the sergeants schedule their meal break times for the day (D. 12(m) ¶ 21). Detectives are not present at roll call and can take their meal breaks at any time during their shifts (*id.* ¶ 22). Clerks are also scheduled for a meal break during each shift, either by the sergeant working their shift or at a time that clerks themselves select (*id.* ¶ 49).

As a result, the employees in all five categories were and are in fact scheduled for 30–minute meal breaks in each shift, during which time they are relieved from their normal duties and are generally free to eat or to go about whatever personal business they can conclude within Bartlett's village limits (*id.* ¶¶ 25–31, 50). They remain subject to several restrictions, however, the most noteworthy of which are that all of them other than detectives and clerks must remain in radio contact subject to being recalled to duty (*id.* ¶ 30), while clerks must generally take their meal breaks on the Police Department premises (*id.* ¶ 52). This opinion later sets out a more detailed examination of the relevant restrictions.

Whenever an employee believes that a lunch period has been interrupted for any reason, he or she is both entitled and expected to attempt to reach the shift sergeant to have it rescheduled (*id.* ¶¶ 40, 56). Whenever that happens the employee has been granted a fresh 30–minute meal break if at all possible, but has been paid for overtime instead if a meal break has been missed (*id.* ¶¶ 41–47, 56–60). In that latter event the employees have been instructed to put in overtime cards for the entire half-hour (*id.* ¶¶ 42–44, 57–59). For the period between January 1990 and March 1993 fully 138 overtime cards were submitted by the patrol officers, detectives and CSOs, all of whom were then reimbursed at their overtime rates of pay (*id.* ¶ 47).[4] During the same period, clerks submitted 20 such cards and were also compensated accordingly (*id.* ¶ 60).

This action was originally brought in the Circuit Court of Cook County via a Com-

plaint for Declaratory Judgment and Accounting and was timely removed to this District Court. Three counts are set out in the Complaint, the first seeking a declaratory judgment that Bartlett has breached its contractual obligations assertedly created by two documents that it has promulgated, the second claiming that Bartlett has violated FLSA's overtime provisions and the third asking for an accounting. Bartlett's motion for summary judgment on the first two counts (those stating the substantive claims) will be dealt with in reverse order.

*FLSA Claims*

This Court's task in deciding whether or not the half-hour daily meal periods at issue in this case were compensable work time within the meaning of FLSA is substantially facilitated by last year's *Alexander* decision from our Court of Appeals. *Alexander* considered the claims of a group of Chicago police officers who (much like the employees in this case) felt that certain restrictions imposed on their lunch breaks justified overtime compensation. After the district court had granted the City's motion for a Rule 12(c) judgment on the pleadings, our Court of Appeals reversed and remanded for further factual development of the record.

Despite the parallel between the types of claims involved in the two cases, *Alexander* does not of course control this case directly—in principal part because of the very different posture in which the cases have presented themselves. On *Alexander*'s Rule 12(c) motion (as on a Rule 12(b)(6) motion to dismiss) the well-pleaded allegations of plaintiffs' complaint must be taken as gospel (*Alexander*, 994 F.2d at 336), while on the current Rule 56 motion this Court has been armed with the actual *facts* (thus causing the Complaint's allegations to drop out of consideration, see Rule 56(e)).

■ To the extent that *Alexander*, 994 F.2d at 335–36 recognized a similarity between its Rule 12(c) context and that under Rule 56, the parallel lies only in the requirement in both situations that reasonable inferences must be drawn in favor of the non-

4. It will be recalled that sergeants were fully paid for all lunch periods during that time frame.

movants (in both instances the employees).[5] But the important difference is that the required reasonable inferences are drawn from two entirely different sources: in the Rule 12(c) situation, from the employees' own factually unsupported allegations (*id.* at 336), but in the Rule 56 situation, from the actual facts as they have been presented in the parties' evidentiary submissions (as focused by their GR 12 statements).

In sum, what this Court has specifically been furnished as grist for its decisional mill in this case is the "sufficient development of the facts to enable a capable application of the appropriate predominant benefit standard, including a determination of whether the officers are unable to pass the mealtime comfortably because their time or attention is devoted primarily to official responsibilities"—the very factual development that *Alexander,* 994 F.2d at 339 found was lacking in that case. *Alexander, id.* expressly recognized that it was *not* holding "that resolution of the FLSA mealtime compensability issue in the countless factual configurations that might arise will always require a trial." And *that* determination—whether a trial is indeed required under the specific factual configuration at issue here—is the determination that this Court is now called upon to make, and that has frequently been made in the employer's favor by other courts acting in the summary judgment mode (*Avery v. City of Talladega,* 24 F.3d 1337, 1347 (11th Cir.1994));[6] *Henson v. Pulaski County Sheriff Dep't,* 6 F.3d 531, 535–36 (8th Cir.1993); *Bagrowski v. Maryland Port Auth.,* 845 F.Supp. 1116, 1118–20 (D.Md.1994); *Cloutier v. City of Phenix City,* 834 F.Supp. 366, 369–72 (M.D.Ala.1993); *cf. Bright v. Houston Northwest Medical Ctr. Survivor, Inc.,* 934 F.2d

671 (5th Cir.1991) (decided in the comparable context of a directed verdict; see *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)).

▪ *Alexander* does provide two important guides for this Court's inquiry. For one thing, it teaches that two regulations (including the specific factual examples that one of them includes) dealing with the excludability of meal periods from hours worked[7]—29 C.F.R. § 785.19(a) and, for public employers opting into Section 207(k), 29 C.F.R. § 553.-223(b)—are informative but not determinative in the evaluation (*Alexander,* 994 F.2d at 336–37). Second and critically, *Alexander, id.* at 337 expressly holds:

> The appropriate standard is instead the one articulated in *Lamon* [v. *City of Shawnee,* 972 F.2d 1145 (10th Cir.1993)]—a standard that sensibly integrates developing case law with the regulations' language and purpose. Under *Lamon,* a law enforcement employee is completely relieved from duty during a meal period "when the employee's time is not spent predominantly for the benefit of the employer," 972 F.2d at 1155, 1157; stated differently, the "FLSA requires remuneration for meal periods during which a police officer is unable comfortably and adequately to pass the mealtime because the officer's time or attention is devoted primarily to official responsibilities." *Id.* at 1155–56.

That same predominantly-for-the-benefit-of-the-employer standard has also been adopted by most of the other Courts of Appeals that have considered the question (most recently *Avery* in the Eleventh Circuit). This opinion turns then to the analysis in those terms.[8]

---

5. As *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) teaches, on the current Rule 56 motion this Court is not required to draw "every conceivable inference from the record—only those inferences that are reasonable" in favor of the nonmovant employees.

6. This opinion was already in final form and awaiting the transcription of its last set of edits when on August 12 Bartlett's counsel were good enough to file a document citing *Avery* as additional authority. As the opinion reflects, *Avery* had already been spotted by this Court and built into the text in a number of places.

7. FLSA itself does not define "work" as such (*Alexander,* 994 F.2d at 336).

8. This Court's opinions rarely engage in any detailed discussion of the facts of other cases to demonstrate how they are distinguishable from (or parallel to) the case under consideration. That type of discussion is often encountered in advocates' briefs (attempting either to explain away or to draw to their aid some earlier precedent), but this Court's view is that simply comparing cases analytically in the course of reading them almost always does that job. In this instance that is certainly true of *Wahl v. City of Wichita,* 725 F.Supp. 1133 (D.Kan.1989), a case

*Patrol Officers and Detectives*

▪ As for Bartlett's patrol officers and CSOs, the single most significant restriction (though not the only one) that they urge is Bartlett's reservation of the right to place emergency calls to them during their lunch breaks.[9] But that *potential* does not convert a free meal break into "time … spent predominantly for the benefit of the employer." As *Lamon,* 972 F.2d at 1157 puts it:

> That a police officer is on-call and has some limited responsibilities during meal periods does not perforce mean the officer is working.

Accord, *Bagrowski,* 845 F.Supp. at 1120 ("Being on-call in case of emergency, does not, in and of itself, make meal time, work time"). *Alexander* not only defined the already-quoted relevant standard but also emphasized the factual information that was wanting there but is present here (994 F.2d at 339–40):

> There is a universe of possibilities about when a meal is "interrupted" so as to require compensation. At this point we can only speculate about the frequency of communication to police officers at mealtime, the frequency and extent of interruptions, the effect of the various restrictions on an otherwise uninterrupted meal period and a variety of other factual matters. The pleadings alone simply do not reveal to what extent the officers' attention was turned to official duties.

As that and Judge Crabb's concurrence (*id.* at 341) make plain, it is the *frequency* and

extent of the interruptions rather than their mere possibility that informs the decision whether "the officer's time or attention is devoted primarily to official responsibilities."

▪ Here the patrol officers and detectives proffer no evidence that, even with the required favorable inferences, indicates that they ate subject to frequent interruptions (a sharp contrast, for example, with the situation before the district court in *Lamon v. City of Shawnee,* 1990 WL 186280, at *5–6, 1990 U.S.Dist. LEXIS 15906, at *16–*17 (D.Kan. Oct. 4, 1990)).[10] Instead the contrary situation prevails: Bartlett's well-substantiated allegation that the employees are called on to deal with lunch-time emergencies only a few times per month stands uncontested.[11] What follows is a brief summary of that substantiation.

Bartlett's dispatchers maintain a procedure under which they route calls away from patrol officers and detectives who are on their meal breaks (D. 12(m) ¶ 37; see *Alexander,* 994 F.2d at 341 (Crabb, J. concurring), stating that such a deferral procedure strengthens the presumption that emergency calls are incidental to on-call status). Such interruptions as do occur are often of short duration (Kopanitsanos Dep. 21; Perry Dep. 7). As for lunch-time interruptions arising out of questions from civilians, by definition those are largely a function of where the employee chooses to take his or her meal. Here the employees have extensive freedom to select the places that they eat—anywhere except taverns (D. 12(m) ¶ 34). Those who

---

discussed at some length in *Alexander,* 994 F.2d at 338–39. Just to lay that case alongside this one, and to observe the dramatic contrasts between the two cases' respective levels of employee entitlement and their respective constraints on the employees' activities, is enough to demonstrate graphically the inapplicability of the *Wahl* analysis and result to this case.

9. As for the detectives, D. 12(m) ¶ 30 says in part: Detectives are not required to wear uniforms, monitor radios or remain able to return to active duty during their meal breaks.

10. P.Mem. 10 is guilty of material hyperbole in asserting:
The plaintiffs [sic] officers who gave depositions reported varying degrees to which they were called off lunch to return to duty.

Although patrol officer Rogers Dep. 42–43 testified to somewhat frequent interruptions when he "first started" (four and one-half years ago, *id.* 5–6), he admitted that increased staffing has alleviated the problem (*id.* 43), and he later equivocated on his estimates anyway (*id.* 44).

11. D. 12(m) ¶¶ 34–35, 39; Gost Dep. 12 (stating that he has never been called back); Knight Dep. 8–9 ("several times" in the past ten years); Perry Dep. 6 ("several times a year"); Sales Dep. ("once or twice a month"); Vergin Dep. 14 (two or three times per month); Stickling Dep. 8 (uninterrupted lunches were the norm); Leonas Dep. 11 (uninterrupted lunches "90% of the time"); Kopanitsanos Dep. 21 (not contacted very often before she became a sergeant).

pick locations such as the center of town are obviously more likely to be approached by civilians (Gost Dep. 16) than those who lunch in more private spots such as the station house or their own homes. In any event, there has been no substantiation for any claim that the employees have been badgered by civilians to any extent even remotely approaching the point at which their time is not their own (see *Bagrowski*, 845 F.Supp. at 1120; United States Dep't of Labor Wage & Hour Div. Opinion Letter (July 29, 1985) ("Department of Labor Opinion Letter"), reprinted in 6A Lab.Rel.Rep. (BNA) WHM 99:5005, 5006 ("we would not consider infrequent interruptions of short duration which may occur when a citizen compliments, or asks a law enforcement employee a simple question, as nullifying the exclusion of an otherwise bona fide meal period from compensable hours of work")).

Under the circumstances presented by the evidence in this case, it cannot be said that time spent on-call constitutes compensable work time as such. As *Armitage v. City of Emporia*, 982 F.2d 430, 432–33 (10th Cir. 1992) (citations omitted) has explained: [12]

> In the instant case, the detectives were allowed to do as they pleased while on call, as long as they remained sober, could be reached by beeper and were able to report to duty within twenty minutes of responding to the page. They were called in on average less than two times per week, as opposed to the twenty to thirty times per week for the firefighters in *Renfro* [*v. City of Emporia*, 948 F.2d 1529 (10th Cir. 1991)].... Although the detectives' services are certainly beneficial to the public, to require compensation under these facts would require that all on call employees be paid for standby time. This would be a major change in the law of the FLSA.

Accord, *Avery*, 24 F.3d at 1347; *Henson*, 6 F.3d at 536; *Lee v. Coahoma County*, 937 F.2d 220, 225 (5th Cir.1991); *City of University Park v. University Park Police Ass'n*, 766 S.W.2d 531, 537 (Tex.Ct.App.1989).

■ It must be kept in mind, of course, that the compensability question involves a congeries of factors—not just the frequency of interruptions. To that end it is highly significant that any time a patrol officer or detective is actually forced to forgo any part of a meal because of an interruption, Bartlett either reschedules (conditions permitting) another full 30–minute break—regardless of the time elapsed on the previous one—or else compensates him or her for the entire period upon written submission of a compensation request (D. 12(m) ¶¶ 40–46).

In an effort to respond on that score, P.Mem. 10 says (again mischaracterizing the actual evidence):

> However, officers generally testified that it was their practice, and perhaps an almost universal practice, not to submit overtime cards if they missed part of their 30 minute lunch period but were able to consume a meal. Even Acting Chief Palmer admitted this. (Palmer dep. p. 28).[13]

But quite apart from the fact that Bartlett really cannot be faulted for the manner in which such choices may have been exercised by individual personnel on their own,[14] what is far more significant is that the non-supervisory members of the department were affirmatively urged to submit such overtime cards (Palmer Dep. 28 ("They are encouraged to. They are told to. They have been told at staff meetings."); Kopanitsanos Dep. 25) and that shift sergeants even solicit such requests when they know that a patrol officer's break has been interrupted (*id.*; Vergin Dep. 18). Such encouragement is confirmed

---

12. *Armitage*, like our Court of Appeals in *Alexander*, relied primarily on *Lamon*.

13. [Footnote by this Court] That last citation is flat-out wrong. Page 28 of the Palmer deposition says nothing of the sort. All that he testified to was his own personal decision not to put in an overtime card when, as a sergeant, he had (for example) used only 20 instead of 30 minutes of his lunch break at the time that he was called back to duty.

14. In addition to Palmer's testimony referred to in n. 13, see Stickling Dep. 10 ("It's just personal choice"); Vergin Dep. 19 ("There's times I forgot to put in [sic] overtime card at the end of a shift. If I missed it, that's my fault"); Leonas Dep. 13 (providing reasons (such as "too busy") that he did not get around to submitting cards); Gost Dep. 11; Nicholas Dep. 14.

at the other end as well—by the testimony of numerous patrol officers and detectives (Gost Dep. 11–12; Stickling Dep. 10; Nicholas Dep. 14; Sales Dep. 10; Vergin Dep. 18). And as already stated, Bartlett's practice has in fact resulted in a great many requests by officers for overtime payment. From January 1990 through March 1993 patrol officers, detectives and CSOs submitted 138 cards, *every one of which* was honored (GR 12(m) ¶ 47; Norris Aff. ¶¶ 3–4 and D.Ex. R1).[15]

Thus the evidence reflects (a) that interruptions are extremely infrequent in the first place (see *Bagrowski*, 845 F.Supp. at 1119), (b) that interrupted lunch periods are often simply rescheduled for another time, obviating any need to apply for overtime in any case (D. 12(m) ¶¶ 40–41),[16] and (c) that for any lunches that cannot be rescheduled, overtime has been granted on request without exception. On those facts it cannot fairly be said that patrol officers' and detective lunch periods are spent predominantly for Bartlett's benefit.

Nor is that conclusion altered by reference to the other mealtime constraints about which the patrol officers and detectives complain here. Though they contend that their time is not really their own (so as to trigger compensability under the principle stated in such cases as *Armitage*, 982 F.2d at 432), the *evidence*—as contrasted with counsel's arguments—shows the patrol officers and detectives exercising substantial free control over their meal breaks (see *Cloutier*, 834 F.Supp. at 371–72).

Aside from the already-discussed emergency-recall scenario, patrol officers on meal breaks have been and continue to be largely free to do as they please. So long as the patrol officers monitor their radios, they need not tell anyone where they intend to go

during their breaks (Leonas Dep. 10). As Gost Dep. 13 put it, "I don't patrol. I don't drive. I don't look for situations when I'm on lunch." Sales Dep. 5 adds that he prefers to stay in the station away from potential problems when he is in his break-time "lax mode." And the detectives are not subject to the radio-monitoring requirement at all.

In addition to eating lunch, the employees may choose to run errands to take care of personal business (Perry Dep. 5; Vergin Dep. 14) or to go home (Perry Dep. 4; Stichtling Dep. 5) or to the house of a friend or relative (Gost Dep. 6)—and as for lunch itself, they may choose to eat virtually anywhere, including restaurants in town (Knight Dep. 6; Stichtling Dep. 6). Others sometimes elect to eat in their cars (Leonas Dep. 20; Gost Dep. 18). They may watch a Bears game (Gost Dep. 18; Knight Dep. 7), communicate with others (Knight Dep. 7), read a book, magazine or newspaper (Sales Dep. 5, 7; Gost Dep. 5; Stichtling Dep. 7; Vergin Dep. 14),[17] or simply stay away from all potential situations and relax in the station (Perry Dep. 4; Sales Dep. 5–6; Knight Dep. 6; Vergin Dep. 11).[18] Except for taverns, they are basically permitted to go anywhere they desire within the village (D 12(m) ¶ 26). Indeed, they are permitted to use their police vehicles to get them to their lunch time destinations or to conduct personal business, such as drive-through banking (D. 12(m) ¶ 29; Palmer Aff. ¶ 16; in that respect, see *Bagrowski*, 845 F.Supp. at 1118).

What has been said to this point dispatches as unfounded the major strands of the relationship that might even arguably confer a right to compensation for the lunch periods. But P.Mem. 9 lists a number of other purported break-time restrictions that, according to the employees, ostensibly call for the

---

**15.** P. 12(n) ¶ 27 seeks to create a factual issue in this area of the case. But an examination of the record citations does not disclose any material admissible evidence negating Bartlett's version.

**16.** Nowhere do the employees even insinuate that anyone discouraged them from seeking to reschedule a new meal break.

**17.** Plaintiffs seek to make something of Carlson Dep. 14, which explained that a rule has been instituted proscribing newspaper reading in

squad cars. Apparently some members of the public, not realizing that such officers were on break, perceived the police as slacking off their duties. No one disagrees, however, that officers are free to read whatever they want anywhere else.

**18.** P. 12(n) ¶ 17 asserts "Officers are expected to maintain a police presence in town and be visible," but that too is really unsupported by the record.

conclusion that their time is spent primarily for Bartlett's benefit. Little discussion is needed to dispose of those contentions as well.

First, the fact that the patrol officers (but not the detectives) must remain in their standard uniforms—which includes their gun belts (P. 12(n) ¶ 10)—does not make a difference (see Department of Labor Opinion Letter; *Avery*, 24 F.3d at 1347; *University Park*, 766 S.W.2d at 532). And the reason is obvious: By the very nature of their job, patrol officers may be required to respond to short-notice crises without the delay that would be entailed by having to change back into their uniforms.

It is frankly absurd for the employees to complain that "usually an officer cannot take lunch with another officer" (P.Mem. 9; P. 12(n) ¶ 16)—a limitation that is inherently compelled by the limited numbers of personnel and by the need to have some of them on active duty at all times—just as there is no substance to the objection that officers are not permitted to leave town during their half-hour breaks (*Avery*, 24 F.3d at 1347; *University Park*, 766 S.W.2d at 532). Moreover, D. 12(m) ¶ 31 (uncontroverted by the employees) explains that sergeants have "routinely" granted exceptions when there are requests for permission to leave the village limits for meals nearby.

As for the other criticisms leveled against the applicable restrictions,[19] the rules established by Bartlett are certainly no more stringent (and in some instances are conspicuously *less* so) than those in other cases in which municipalities have prevailed as a matter of law. For example, *Avery*, 24 F.3d at 1347 has explained in language that might well have been written for this case (footnote and citation to *Lamon* omitted):

The City undoubtedly benefits from the restrictions it imposes on the plaintiffs' meal breaks, but the fact that the City benefits from the restrictions does not mean that the plaintiffs' meal breaks are predominantly for the City's benefit. The overwhelming testimony of the patrol officers and patrol lieutenants themselves is that they are free to spend their meal breaks in any way they wish so long as they remain in uniform, leave their radios on, and do not leave the jurisdiction. The detectives need simply leave a phone number where they can be reached in case of an emergency. The plaintiffs may return home, stop at the bank, pick up their dry cleaning, or run other personal errands. In sum, the plaintiffs are able to "comfortably and adequately pass[ ] the mealtime." No reasonable jury could find that the plaintiffs' meal periods generally are spent predominantly for the benefit of the City. Therefore, the district court correctly held that the meal periods are not compensable under the FLSA. . . .

And relatedly *Henson*, 6 F.3d at 536 has said:

The only potential restrictions on the officers' use of their meal periods for their own purposes arise from the possibility that citizens might ask them questions and from the monitoring of their radios for emergency calls to return to service. We conclude that these restrictions could not support a finding that the patrol officers spend their meal breaks predominantly for the benefit of their employer. The officers have a full thirty minutes to use for their own purposes and in which to travel to any desired location, subject only to the possibility of being recalled in an emergency. Because the employees' evidence does not

**19.** For one thing, P.Mem. 9 says that patrol officers are not permitted to sleep or nap during lunch. Such a requirement flows directly from the fact that Bartlett is within its rights to oblige its patrol officers to monitor their radios. Similarly, the purported regulation against using the Department weight room during lunch (*id.*) is really nothing more than an extension of the rule that patrol officers cannot remove their gun belts, shirts or vests while working out (Gost Dep. 17). As for the contention (again at P.Mem. 9) that sworn personnel cannot eat in places that

serve alcohol, that simply misrepresents the record, for they can and in some instances (Vergin Dep. 21–22) regularly do just that. That differs sharply from the actual restriction against eating lunch in a nonsegregated drinking establishment such as a tavern (Carlson Dep. 14). See also *Hill v. U.S.*, 751 F.2d 810, 814 (6th Cir.1984). There is no need to prolong the discussion by treating with each nit advanced by the employees: Their totality is no more probative than they are individually.

create a genuine issue of material fact, we affirm the summary judgment in favor of the police department.

Accord, *Armitage*, 982 F.2d at 432–33; *Bagrowski*, 845 F.Supp. at 1118–20; *Cloutier*, 834 F.Supp. at 371–72; *Hill v. United States*, 751 F.2d 810, 811–15 (6th Cir.1984) (letter carriers' mealtimes); *Birdwell v. City of Gadsden*, 970 F.2d 802, 807–10 (11th Cir. 1992) (detectives' on-call time).

In sum, it would be unreasonable to read the evidence as creating a material factual dispute under the principles voiced in *Alexander* and like cases. Summary judgment is therefore mandated against the patrol officers' and detectives' FLSA claims.

*CSOs*

Because Bartlett's three CSOs (Guasaferri, Misheikis and Whitaker) have been subject to essentially the same restrictions and privileges as the just-discussed sworn personnel (D.Mem. 6 n. 3), the same conclusion follows as to them. Nothing has been brought to this Court's attention to suggest otherwise. Misheikis Dep. 8–9 is illustrative:

Q: Are you ever called back to active duty?

A: Yes, I am.

Q: How often?

A: Not very often at all.

Q: And when you are called back, is your lunch period rescheduled?

A: Most of the time, yes.

Q: In those times that it's not rescheduled, do you submit overtime cards?

A: Yes.

Q: And are you paid?

A: Yes, I am.

Q: Have you ever been denied overtime when you submitted a card?

A: No.

Mr. Perry: That's it for me.

Again Bartlett prevails as a matter of law.

*Clerks*

P.Mem. 21 precedes its discussion of Bartlett's clerks with a caption that essentially acknowledges that those employees have an even weaker case for compensation than the sworn personnel.[20] It is true that clerks must also remain ready to return to active duty in the event of emergency, but interruptions of that nature are unsurprisingly infrequent (D. 12(m) ¶ 55; Albee Dep. 20–21 ("Maybe once a month")). Such other claimed inconveniences as requests for assistance or questions from members of the public are also relatively uncommon and usually do not last more than a few minutes anyway (D. 12(m) ¶ 54; Bourgerie Dep. 9–10; and see the de minimis rule cited in *Hill*, 751 F.2d at 815).

Clerks enjoy the already-discussed right to reschedule any lunch that is cut short (D. 12(m) ¶ 56) or, failing that, to put in for overtime (*id.* ¶ 57). No clerk has ever been denied such a request (*id.* ¶ 59), and from January 1990 through March 1993 clerks have submitted and have been paid for 20 such requests (*id.* ¶ 60).

It is also undisputed that clerks are just as free to engage in personal pursuits during their lunches as the rest of the Bartlett force—and they do (D. 12(m) ¶¶ 50–51; Albee Dep. 16–18; Bourgerie Dep. 13; Scianna Dep. 12–13). Just one stay-on-the-premises requirement applies exclusively to clerks: They are not allowed to lunch outside the building when a single clerk is on duty. But that does not alter the result (29 C.F.R. § 785.19(b) says "It is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period"; accord, *Bagrowski*, 845 F.Supp. at 1120 n. 4). Bartlett is entitled to summary judgment against the clerks as well (*Kaczmerak v. Mount Sinai Medical Ctr.*, 28 Wage & Hour Cas. (BNA) 1165, 1166–67, 1988 WL 81633 (E.D.Wis. 1988)).

**20.** Consistently with that, only a bobtailed statement in P. 12(n) ¶ 29 addresses the clerks' situation (in addition to the employees' total failure to respond to D. 12(m) in that respect, as in all others).

*Sergeants*

■ Any discussion of the factual aspects of the sergeants' claim can be deferred to the section dealing with their contractual right of recovery, for their FLSA claims are barred by limitations. That is so because Section 255(a) bars claims not commenced within two years after the cause of action has accrued.[21] Because Bartlett began to pay its sergeants for their lunch breaks in 1990, this 1993 lawsuit on their part is out of time. Indeed, their Memorandum was devoid of any response to the argument at D.Mem. 9 n. 5 in that regard.

*Summary*

Each of the FLSA claims has succumbed on analysis, though not all for the same reasons. Complaint Count II is therefore dismissed with prejudice.

### Breach of Contract Claims

■ Complaint Count I rests on identically-worded provisions in two documents promulgated by Bartlett effective October 15, 1985: its Administrative Policy # 11 and General Order No. 8505 (collectively the "Policies"). They set out Bartlett's efforts to set out the impact of the then-newly-issued Department of Labor FLSA regulations on various subjects, including lunch periods:

*POLICY STATEMENT*

In its recent decision, *Garcia v. San Antonio Metropolitan Transit Authority*, [469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)], the United States Supreme Court ruled that local governments are subject to the provisions of the [FLSA].

The U.S. Department of Labor has issued enforcement and compliance regulations to which the Village of Bartlett will adhere. The following information in the PROCEDURES section will outline the effect of this ruling on the Village of Bartlett.

*PROCEDURES*

\* \* \* \* \* \*

*Lunch Periods*

*Sworn Police Officers:* Police Officers will be scheduled for a 30 minute uninterrupted lunch period during each duty shift. The Officer will be free to utilize this time as his/her own and will not be expected to perform any work during the lunch period. An Officer is expected to maintain radio contact with DuComm in the case an emergency arises and the Officer is called to respond.

Periodic radio contact is not considered an interruption unless such contact requires the Officer to leave his/her lunch period to perform a duty. In the event the lunch interruption occurs, an Officer may be rescheduled for another lunch period during the shift if possible. In the event another lunch cannot be scheduled, the time will be considered as paid time at straight time.

The Officer is required to remain on the beat so that the Officer may remain on duty until lunch and return to duty immediately following lunch.

*Civilian Police Department:* Every employee will be scheduled for an uninterrupted lunch period (30 minutes) during each shift. The employee will not perform any work during the lunch period. If the lunch period is interrupted, it will be rescheduled for a new 30 minutes or considered hours worked.

Bartlett takes issue with the sufficiency of the Policies' language to create a contractual obligation within the boundaries marked out by the seminal decision in *Duldulao v. Saint Mary of Nazareth Hosp.*, 115 Ill.2d 482, 490, 106 Ill.Dec. 8, 12, 505 N.E.2d 314, 318 (1987):

First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of

---

21. Although wilful violations extend the statute to three years (*id.*), the sergeants have wisely declined to advance such a position in light of Bartlett's explicit protections against uncompensated lunch-hour work.

the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed.

But Bartlett is wrong. Its Policies do contain such a clear promise, one that plainly conveys the idea of an offer and was disseminated to the employees in the requisite manner, and one that the employees could unquestionably be said to have accepted by continuing work.[22]

■ As a backstop position, D.Mem. 4 urges that "the policies do no more than reflect the Village's legal obligations under FLSA." [23] While the Policies do begin with the preface that they will outline the effect on Bartlett of the applicability of FLSA, the employees have it right when they say that the specific measures that Bartlett adopted in that respect were a matter of its own choice. Because Bartlett could have complied in any of a number of ways (such as by setting different types of restrictions or by simply paying for all lunches), the precise promises that it did choose to make were a product of its own independent decisionmaking and were thus enforceable offers that, when accepted, became enforceable commitments.[24]

But just as the employees are plainly right in their ability to invoke the Policies' promises as a contractual matter, so they are plainly wrong in their characterization of those promises. P.Mem. 8 contends that Bartlett has guaranteed "the right to be completely free from police responsibility during the lunch break," and P.Mem. 12 says that "General Order 85–05 seems to be a global prohibition of work of any kind during the lunch break." Nothing in the language of Bartlett's offer even suggests (let alone actually promises) that employees will be "completely free from police responsibility" or "work of any kind." Instead the Policies expressly contemplate ongoing radio contact and geographic restrictions ("on the beat")— and each of the two references to an "uninterrupted lunch period" (one as to sworn personnel and the other as to civilian employees) is expressly coupled with provisions spelling out the consequences of any interruption: the rescheduling of lunch if possible and, if not, payment at straight time.

Thus Bartlett's contractual undertakings are certainly no greater than those already analyzed in the FLSA section of this opinion.[25] And it therefore follows that the contract claims of four categories of employees (patrol officers, detectives, CSOs and clerks) necessarily fail for the reasons already discussed. Just as they were unsuccessful in attempting to demonstrate that their meal breaks were spent predominantly or primarily for the benefit of Bartlett, those employees have been at least equally unable to demonstrate that they were not "free to utilize this time as [their] own"—certainly in the manner in which that last phrase is cabined by the other provisions of the Policies discussed in the preceding paragraph. In sum, those four categories of employees have no ground to

---

**22.** It may be noted parenthetically that patrol officers and detectives (but not sergeants) are unionized and hence have been covered by collective bargaining agreements ("CBAs") since 1987. Like the sergeants, non-sworn civilian personnel have not been and are not covered by any CBA. Although Bartlett contends that the CBAs preclude any contractual claim by the covered employees based on the Policies, that argument is totally empty—not worth discussing.

**23.** Relatedly, Bartlett also advances the untenable position that the FLSA "preempts" the employees' contract claim. But it is obvious that a municipality can contract to provide *more* protection against uncompensated overtime than FLSA requires (*Avery*, 24 F.3d at 1348; *Atlanta Professional Firefighters Union v. City of Atlanta*, 920 F.2d 800, 806 (11th Cir.1991)). And as a

matter of logic, that greater protection can just as well take the form of a promise to pay for a longer time period (that is, the limitations period for a written contract rather than FLSA's shorter limitations period) as, for example, the form of a promise to pay double time rather than time-and-a-half for overtime.

**24.** Indeed, *Avery*, 24 F.3d at 1348 upheld a breach of contract claim even where the employees' handbook did nothing more than incorporate FLSA's terms by reference.

**25.** Though it is unnecessary to pause on the point for the moment, this opinion will explain a bit later why Bartlett's contractual undertaking is actually *less* demanding than FLSA's in at least one critical respect.

assert that they have been contractually promised anything beyond what has already been found insufficient to warrant compensation under FLSA.

Bartlett's sergeants' contractual claims, however, pose the need to take a closer look at the precise content of Bartlett's promise as embodied in the Policies. Because the sergeants are responsible for coordinating entire shifts (Carlson Dep. 32; Nicholas Dep. 11), they regularly spend portions of their lunches monitoring their radios. Carlson Dep. 30–32 explained:

> I was constantly getting calls [at home during lunch] from officers for information, officers requesting to do things as per orders, go out of their beats—requesting permission, and calls from the dispatch system about reassigning calls, or which car should she send to back up another officer.
>
> \*　\*　\*　\*　\*　\*
>
> With the—well on lunch I have to constantly monitor, try to monitor all radio traffic. We had cases where the dispatch system was assigning wrong cars, wrong beat cars to wrong areas because the area was growing so fast and changing so fast the system wasn't quite keeping up, and they were assigning inappropriate backup cars.... So I had to monitor this to make adjustments.

Carlson went on to describe those interruptions as occurring "almost daily" (*id.*). To much the same effect (though not characterizing the interruptions in as much detail or as being quite so extensive), see Kopanitsanos Dep. 12–13 and 23–24 and Nicholas Dep. 12–

13. All those versions must of course be credited on the current motion.[26]

Because the sergeants' FLSA claims have been barred by the statutory limitations period, there is no occasion to parse the FLSA standard to examine whether such interruptions rendered the sergeants' meal times "predominantly for the benefit of the employer" or caused the sergeants' time to be "devoted primarily to official responsibilities" (*Alexander*, 994 F.2d at 337).[27] Instead the sergeants' contract claim poses the question whether Bartlett has reneged on the promises that it made in the Policies, promises that have not been rendered unenforceable by the ten-year period applicable to written contracts under 735 ILCS 5/13–206.

In that respect the key to the issue lies in the Policies' express limitation on the concept that the police personnel "will be scheduled for an uninterrupted lunch period":

> Periodic radio contact is not considered an interruption unless such contact requires the Officer to leave his/her lunch period to perform a duty.

Clearly the sergeants have not shown that Bartlett has violated that pledge. Indeed, the very burden about which they complain *is* that imposed by periodic radio contact[28]— something that is unambiguously exempted from the coverage of Bartlett's promise *unless* the officer is compelled to leave lunch to perform his or her duty. No evidence whatever has been tendered that such was the case or, if it were, that the sergeants were not provided with the contractual alternatives of either rescheduling their meal periods or receiving the monetary equivalent.[29]

---

**26.** With the exception of the greater frequency of interruptions that has been reflected in the text, nothing in the evidence or in counsel's argument suggests that the sergeants' factual situation was any different from that of the patrol officers and detectives. It must be concluded that all of the freedoms of those employees as to how their lunch periods could be spent, as described earlier in this opinion, applied to the sergeants as well.

**27.** Both "predominantly" and "primarily" are of course terms of quantification connoting a substantial weighting in the indicated direction. But as the text says, it is unnecessary to decide whether under the circumstances that inquiry

would pose an issue for a factfinder or whether it could be resolved as a matter of law.

**28.** Although it is hardly necessary to elaborate on a word in such common usage, it is instructive to note that *Webster's Third New International Dictionary* 1680 (unabridged, 1986) defines "periodic" as "occurring frequently from time to time" and also lists "recurrent" and "frequent" as synonyms—all of those terms providing a total match for the pattern of conduct that the sergeants describe.

**29.** Indeed, each of the testifying sergeants—although complaining of interruptions—has acknowledged that he or she had those rights but

In summary, the sergeants have failed to create a reasonable inference that Bartlett has broken its promise to them as framed in the Policies. Accordingly they, like the employees in the other four categories, have failed on their contract Count I as a matter of law.

### Conclusion

There is no genuine issue of material fact as to any of the claims of any of the plaintiff employees,[30] and Bartlett is entitled to a judgment as a matter of law. This action is dismissed with prejudice in its entirety.

---

did not always choose to exercise them (Carlson Dep. 19; Kopanitsanos Dep. 13–14; Nicholas Dep. 14–15, 18). Of course the sergeants are not free thus to forgo their known contractual rights as a voluntary matter, and then to sue Bartlett to enforce those rights.

30. With the substantive claims in Counts I and II disposed of, the employees' claim for an accounting in Count III necessarily fails as well.